ILLINOIS GLASS CO. *v.* UNITED STATES HORSE-RADISH CO.

1. SALES—TITLE—TIME OF TRANSFER.

Under provisions of an agreement that after a specified time goods sold but not shipped to the buyer should be invoiced to the buyer and stored at the expense and risk thereof, title passed at the time they were so invoiced and charged.

2. SAME—LIEN—WAIVER.

By delivery to the assignee for the benefit of creditors of the purchaser, the seller, who extended credit for goods which

had been sold to the assignor and title to which had passed before assignment, waived any right it may have had to a seller's lien.

3. SAME.

And by joining in the execution of the assignment for the benefit of creditors and consenting therein to an extension of credit upon its indebtedness, the vendor waived all right to retain in its hands goods to which title had passed.

4. SAME—ASSIGNMENTS FOR THE BENEFIT OF CREDITORS.

The assignee could not by agreement prefer one creditor over another, or without new consideration relinquish title to property belonging to the assignor.

Appeal from Saginaw; Gage, J. Submitted June 6, 1911. (Docket No. 5.) Decided July 5, 1911. Rehearing denied September 29, 1911.

Bill by the Illinois Glass Company against the United States Horse-Radish Company and John B. Eddington, personally and as assignee for the benefit of creditors of the defendant company, to obtain the allowance of an account as a preferred claim. From a decree for complainant, Wallis Craig Smith, one of the creditors of the defendant corporation, appeals. Modified and affirmed.

*Lucking, Emmons & Helfman* (*Weadock & Weadock*, of counsel), for complainant.

*Wallis Craig Smith, in pro. per.*

HOOKER, J. The complainant and the United States Horse-Radish Company were, respectively, Illinois and Michigan corporations. The latter prepared and marketed horse-radish at and from Saginaw, Mich. Wallis Craig Smith was a stockholder, president, and a creditor to a large amount of the Horse-Radish Company, and he is the appealing creditor in this proceeding, which relates to a claim of the Illinois Glass Company. A chronological statement of certain facts will make the controversy plain.

The relations of the parties began with a contract of which the following is a copy:

"CONTRACT.

[Notation in writing at top of contract.]
"O. K. billed 8—31—08.   T. M. L.
8—16—07.

"Illinois Glass Company hereby agrees to sell, and the U. S. Horse-Radish Co. of Saginaw, Mich., hereby agrees to buy, the following described articles in the quantity and at such prices as are herein indicated, subject to terms and conditions herein below set forth, it being understood and agreed that the quantities specified are necessarily subject to reasonable variations above or below the quantities in gross that are shown.

| Gross. | Articles. | Price. |
|--------|-----------|--------|
| 7,500  | P. M. horse-radish bottles | 2.35 |

"All breakage in transit 3 per cent. or under to be borne by buyer.  All breakage in excess of 3 per cent. to be borne by seller.  The buyer reserves the right to increase this contract to a total of not to exceed 50 car loads at above price up to Jan. 1st, '08.

"Terms:  Thirty days net or 1 per cent. discount for cash if paid within ten days from date of invoice.  Remittance to be made in New York or Chicago Exchange. Prices herein shown are f. o. b. Saginaw, Michigan.

"Shipments:  Shipments to be made as closely as possible to directions as supplied by buyer upon specifications to be furnished at least thirty (30) days in advance of shipping date.  All articles on this contract that are unshipped and in the hands of the Illinois Glass Co., August 1st, '08, shall be invoiced to buyer same as if shipment had actually been made, and therefore stored at the risk and expense of buyer, including expense of insurance.

"Conditions:  The responsibility of Illinois Glass Co. shall cease on the delivery of articles covered by this contract to the transportation company, and upon securing a receipt therefor in good condition, and it shall not be liable for non-fulfillment of this contract caused by fires, strikes, delays in transit, or other causes beyond its control.  This contract shall be binding on Illinois Glass Co. only after approval by an officer of said company at its general office, Alton, Ill., it being expressly understood

that there are no verbal agreements contrary to the terms within expressed.

[Signed]    " K. G. SMITH,
" For Illinois Glass Co.
"U. S. Horse-Radish Co.,
"E. F. VOGT,
"Secretary.

" Approved:
" CHAS. LEVIS, Sec'y,
" General Office."

We understand that the date of the execution of this contract was August 16, 1907.

On August 31, 1908, there remained in the possession of complainant about five car loads of bottles, which were on that date invoiced to the Horse-Radish Company, and charged to it upon complainant's books.   On January 11, 1909, the Horse-Radish Company wrote complainant agreeing to take these bottles in four or five separate shipments of one car load each, to be shipped on the regular 30-day basis at dates stated in the letter, and directed that no more bottles be made under the contract.   Two shipments were made before March 30th, amounting to $1,515.   March 29th the Horse-Radish Company directed the suspension of shipments until further notice.   On March 30th the complainant was approached on behalf of the Horse-Radish Company and one or more of its creditors by a Mr. Ipsen, who asked its signature to an agreement between the Horse-Radish Company and John B. Eddington and some of the creditors of the former, whereby the Horse-Radish Company assigned its property to Eddington for the benefit of creditors, with authority to continue the business for a year, ''conducting the same as far as possible on a cash basis,'' with a view to full payment of its debts and the continuance of the business.

The creditors, by signing, consented to the arrangement and agreed to extend the time of payment of their respective claims for the period of a year, or such part thereof as should be required by the trustee, acting under and in pursuance of the agreement.   The amounts of

the respective claims followed the signatures of the creditors; complainant's being stated as $4,089.

On April 27, 1909, Eddington wrote to the creditors, asking permission to do business on credit, and stating:

"Since the 30th day of March, under and by virtue of certain agreements heretofore entered into between the United States Horse-Radish Company, a corporation, of Saginaw, Michigan, yourself, as a creditor of said company, and me, I have been conducting the business of said United States Horse-Radish Company as trustee for it and its creditors. It already is clear to me that it will be impossible to conduct this business for a year or more or less, on substantially a cash basis, as the agreements above referred to contemplate, but that it will be necessary for me, as trustee, in the conduct of the business, to secure substantial credit in certain directions, otherwise it will be impossible to continue.

"Certain parties from whom I have attempted to secure merchandise on credit have refused to extend such credit unless it is understood and agreed that their indebtedness so created shall have priority of payment out of the assets of the company as against the indebtedness due and owing present creditors who have entered into said extension agreements. In order that I may continue this business as trustee, and conserve the property for the benefit of its creditors, it will be necessary for me to enter into proper agreements with such parties from whom I may hereafter seek credit as trustee, and I, therefore, respectfully request you to advise me forthwith, and in writing of your acquiescence in permitting me in the exercise of my judgment as trustee in the conduct of the business, to create whatever indebtedness I may find it necessary to create, and permitting me to agree with any person or concern that will extend such credit, that such indebtedness so created shall have priority in its payment over any existing indebtedness now due the parties who have theretofore signed the agreement on March 30th and April 8th, or either of them."

Complainant replied as follows:

*"Dear Sir:*
"We have your favor of the 27th inst., and have carefully noted contents, and must say that we are not surprised to learn of the position in which you find yourself

as trustee. It is but natural that those from whom you seek credit will want to know how, and when, and by whom the bills are going to be paid, and they do not feel that they should be called upon to permit a further increase of their present accounts.

"Before signing the blank you send us, we would like to have you define your attitude toward us in regard to the position we find ourselves in, because of this new feature which now presents itself and in which we are very much interested and seem to be at a great disadvantage as compared with other creditors.

"As the manager of your credit department, Mr. Ipsen, probably reported to you, we have certain ware on hand here billed to the United States Horse-Radish Co., under the date of August 31st, in accordance with their contract, which you, of course, as trustee, assume. At the time this trouble arose, we had made two shipments applying on this bill, sending the U. S. Horse-Radish Co. memo. bills of the amounts, which bills they have agreed to pay on a thirty-day basis. These two bills are the only ones of which Mr. Ipsen had any record, and he had not been made aware of the fact that there are any other goods held here under contract to the amount of about $3,000.00. We gave him a statement of the account as it shows on our books and signed an agreement for the amount thereof.

"Because of the question which has now arisen, it seems that in justice to us these two memo. bills are the only ones which should be taken into account, and that when the goods we have on hand here are ordered out, memo. bills should be issued in regular form and the bills paid as prior claims to the bills already issued and which were in your hands at the time the trouble arose. If this ruling should not obtain, we would be furnishing ware for the benefit of other creditors, who would derive some profit, while we would be holding the bag to the extent of the value of the ware we now have on hand."

To this Eddington answered:

"*Gentlemen:*

"We are in receipt of your letter of the 28th, and note carefully what you have to say in regard to ware on hand, and it is our understanding that Mr. Ipsen agreed with you that your claim was extended on the basis of product on ware that had been shipped and was in the hands of

the U. S. Horse-Radish Company. He also explained to me in regard to the ware you had on hand, which is manufactured for the U. S. Horse-Radish Company. You understand we have considerable of this ware on hand, but as soon as the season opens up on horse-radish product, I expect to make arrangements for the selling of this product so as to be able to handle a good volume during the next season and will make every effort to use up the ware on hand and as much more as possible, and, when placing an order for this ware, will consider it a preferred claim and will see that you receive your money for same promptly.

" Will be glad to hear from you if you feel that this arrangement is satisfactory and believe it is all that you could expect under present conditions.

" The letter mailed you we believe should be satisfactory to all creditors, as I will be unable to handle the business successfully without being able to obtain credit."

Complainant afterward shipped the bottles. It admits that the bottles shipped prior to March 30, 1909, are not preferred claims, but insists that those shipped later are, and the court so held, and allowed the claim as such. From this allowance, another creditor has appealed.

We are of the opinion that the title to the bottles in controversy passed to the Horse-Radish Company at the time they were invoiced, and charged to it, and the contract price became a valid obligation against it, falling due 30 days later.

Whatever lien the complainant may have had on the three cars, if any, was lost by the delivery to the assignee, which it was bound to make under the trust agreement which provided for an extension of credit for goods, the title to which had already passed, and which waived the lien.

The correspondence under which complainant claims a contract right to preference does not give him such right. The creditors already had a right (given by the trust agreement) to the application of all assets of the Horse-Radish Company in liquidation of its debts, and that all existing creditors should share in such assets. The assignee had no authority to make complainant a pre-

ferred creditor as to these goods, or relinquish title without a new consideration.

It is fair to say that the correspondence was susceptible of two interpretations, and counsel's claim that there was a misunderstanding between them as to the assignee's meaning is not an unreasonable one. This is unimportant, however, except that it tends to explain and negative the charge of bad faith.

Complainant testified that when it signed the trust agreement it was upon the express agreement that this was to be a preferred claim as to the unshipped cars. This was objected to as tending to contradict the written agreement by parol. We understand that fraud was not claimed. This testimony was denied by Ipsen, and, taking the circumstances into consideration, we are satisfied that no such agreement was made. Counsel's brief leads us to infer that they claim that their client was discriminated against in favor of other creditors having similar claims; but we find nothing in the record so indicating, and the allowance of this as a preferred claim would not be the proper way to redress another improper allowance.

The order must be modified in accordance with this opinion; no part of complainant's claim will be preferred. The amount of the claim we understand not to be questioned in any other respect. The assignee will recover costs of this court.

OSTRANDER, C. J., and BIRD, MOORE, and McALVAY, JJ., concurred.