CADILLAC MACHINE CO. *v.* MITCHELL-DIGGINS IRON CO.

1. SALES—CONTRACTS—PASSING OF TITLE—INTENT.
   The question of when title to property passes from the seller to the buyer is one of intention to be ascertained from the terms of the contract and from the circumstances of the case.

2. SAME—DEFAULT OF BUYER—RESCISSION—WAIVER.
   Where the seller of pig iron, to be shipped in equal monthly installments, on May 1st sent a statement of account in which it charged plaintiff, the buyer, with interest on overdue payments for invoices, such action was inconsistent with an assertion of its right to cancel under the contract for such default, and was in effect an affirmance of the sale and a notice to plaintiff of its abandonment of its right to cancel for such default as had occurred up to that time.

3. SAME—DEFAULT—INTENT.
   Defendant's action in failing to invoice the installments of iron to plaintiff, who was in default for prior installments, for April, May, and June, *held*, to amount to an intention on the part of defendant to "postpone shipment of future installments until prior shipments are paid for," rather than to cancel the contract, as it had a right to do.

4. SAME—DEFAULT—WAIVER—RESCISSION.
   Although defendant, by sending its statement of account to plaintiff on May 1st waived its right to cancel for the default in the February payment, it did not affect the March payment, which was not then in default.

5. SAME—DEFAULT—RESCISSION.
   Plaintiff, in an action for the value of undelivered shipments, having tendered the amount due for the February installment before the contract was canceled, was entitled to said shipment, but being in default for subsequent installments at the time of the cancellation, it could not recover for the same.

Error to Wexford; Lamb, J.    Submitted January 29, 1919.    (Docket No. 17.)    Decided April 3, 1919.

Assumpsit    by    the    Cadillac    Machine    Company

against the Mitchell-Diggins Iron Company for breach of a contract for the sale of certain pig iron. From the judgment entered, both parties bring error. Affirmed.

*Fred C. Wetmore,* for plaintiff.

*Gaffney, Miltner & Millington,* for defendant.

This case was heard by the court without a jury. After such hearing the following findings of fact were made by the learned circuit judge:

"On the 25th day of October, 1916, the parties hereto entered into a certain written contract for the purchase and sale of pig iron, which said contract reads as follows, viz.:

" 'PIG IRON CONTRACT.

" 'Issued from the Office of

" 'Mitchell-Diggins Iron Company, Cadillac, Michigan.

" 'Buyer: Cadillac Machine Company, Cadillac, Michigan.

" ' Seller: Mitchell-Diggins Iron Co., Cadillac, Mich.

" 'Quantity: Eight hundred (800) gross tons.

" 'Grade: No. 2 "Cadillac" L. S. Charcoal Pig Iron.

" 'Price: $20.00 per ton 2,240 lbs. F. O. B. cars furnace.

" 'Payment: Freight cash by buyer, balance cash 30 days. The price is based on present tariff freight rate of per gross ton. In case tariff freight rate declines, the buyer is to have the benefit of such decline. In case the tariff freight rate advances, the buyer is to pay the advance.

" 'If the buyer fails to make payment when due, the seller shall have the right to cancel the contract or to postpone shipments of future installments until prior shipments are paid for. Past due accounts shall bear interest at the rate of 6 per cent. per annum from date of maturity.

" 'Shipment: Equal monthly quantities during the first half of 1917.

" 'Route: Rate of freight XXXXX per gross ton from furnace to ———.

" 'Seller assumes no liability on freight rate.

" 'If shipment is made in installments, this contract for all purposes shall be treated as separate for each installment.

" 'The seller shall not be liable in damages for failure to deliver caused by strikes, accidents or other causes beyond its reasonable control.

" 'The contract is completely set forth herein.

" 'Accepted: CADILLAC MACHINE COMPANY.

" 'W. A. K.

" 'Accepted: MITCHELL-DIGGINS IRON COMPANY.

" 'By D. C. LAMEREAUX.'

"In the month of January, 1917, the aforesaid contract was modified by a verbal arrangement then made by and between the parties thereto to the end and effect that the defendant company was to invoice to the plaintiff company each and every month, during the first half of 1917, 133 tons of iron, but was to retain said iron so invoiced in its yard for a reasonable length of time subject to the disposal of the plaintiff.

"On the 1st day of February, 1917, the defendant in accordance with the contract as so modified invoiced to the plaintiff 133 tons of iron at $20 per ton to cover the January installments and charged the amount, $2,660, to plaintiff's account on its books. March 15, 1917, the February installment of 133 tons of iron of the value of $2,660 was likewise invoiced to the plaintiff and charged to the plaintiff on the books of the defendant. And, on the 21st day of April, 1917, the March installment of iron of 133 tons of the value of $2,660 was likewise invoiced to the plaintiff and charged to the plaintiff on the books of the defendant.

"May 1, 1917, the defendant sent the plaintiff a statement of its account with defendant, which statement included the amounts covered by the invoices for the installments of iron for the months of January, February and March, 1917. No attention was given to this statement of account, so far as the three invoices were concerned, until May 14, 1917, when the plaintiff sent defendant a check for $2,660 without interest to cover the January installment of iron as invoiced under date of February 1st. This payment was credited to the account of the plaintiff on the defendant's books under date of May 19, 1917.

"After April 21, 1917, no further invoices were issued by the defendant to the plaintiff.

"During the month of April, 1917, and again along

the latter part of May, 1917, Mr. Kysor, of the plaintiff company had some talk with Mr. Lamereaux of the defendant company in which the question of permitting the plaintiff to pay cash for the February and March installments, to give notes for the installments for the months of April, May and June, was discussed but no arrangement to that effect was made.

"During the time the aforesaid contract was running and for some time prior thereto, the parties hereto had other dealings between them, which, while independent of the contract, were kept along with the items under the contract and under one head or one account.

"On the 1st day of July, 1917, the defendant sent the plaintiff a credit memorandum for the sum of $5,320, bearing date June 30, 1917, covering the two items called for on the books of the defendant as charged for the installments of iron, invoiced for February and March, 1917. This credit memorandum was accompanied by a statement of the plaintiff's account, after the said credit had been given. The balance then due and unpaid was $2,104.38. This memorandum and account were sent under the express direction of the vice-president, Wm. L. Saunders, with the avowed purpose of closing the deal under the contract.

"The plaintiff, on the 7th of July, 1917, returned the said credit memorandum and with it a check for $2,660 and a letter, directing that the check be applied to the payment of the February installment of iron as invoiced under date of March 15th, and stating that the plaintiff did not desire the defendant to take back the iron, invoiced for February and March, and that the installment for March, invoiced under date of April 21, 1917, would be taken up at an early date.

"This check for $2,660, the amount due on the February installment without interest as provided by the contract, was received by the defendant and passed to the plaintiff's general account, under date of July 10, 1917. Later under date of July 19, 1917, the defendant rendered a statement of its account with the plaintiff to the plaintiff, wherein and whereby $2,104.38 of the $2,660, the amount of the check, had been applied by the defendant to items not subject to the terms of the contract. Along with said statement de-

fendant enclosed its check for $555.62, dated July 10, 1917, as the balance due the plaintiff to settle its account in full as of that date. This check for $555.62 had been received by the plaintiff some time before this date of July 19th. It was left with defendant, at the time of the conference held shortly after July 10, 1917, at Cobbs & Mitchell's office, at which Mr. Kysor for the plaintiff and Mr. Mitchell, Mr. Saunders, and Mr. Ford for defendant were present, and during which conference it was made known to Mr. Kysor that contract deal No. 687 had been closed and was of no more force or effect.

"Later, and on the 20th day of July, 1917, the plaintiff informed the defendant by letter that it, the plaintiff, did not concede the right of the defendant to cancel the contract, and asked for the delivery of 399 tons of the iron at once and that the balance be held in defendant's yard in accordance with the verbal understanding, made in January, 1917. Accompanying this communication was a check of the plaintiff for $2,660 in payment of the March installment of iron as invoiced under date of April 21st, without interest. Under date of July 27th, the defendant returned this check declining to deliver any more iron under the contract.

"August 13, 1917, the plaintiff served notice in writing on the defendant advising it, the defendant, that the plaintiff insisted on having its check No. 16,-415 for $2,660, dated July 7, 1917, applied in payment of the invoice of iron, bearing date of March 15, 1917, covering the February installment, as originally directed. With the above notice, the plaintiff returned the check of defendant for $555.62, dated July 10, 1917, and tendered the defendant a certified check for $2,696.38 in payment of the invoice, dated April 21, 1917, for the March installment of iron with the interest at 6 per cent. from May 21, 1917, to date of tender. In this notice was also a demand upon the defendant for the possession of 266 tons of iron, covered by the invoices of March 15th and April 21, 1917, being the February and March installments of iron under the contract. On the same day, August 13, 1917, the plaintiff made a formal tender to the defendant of the sum of $8,000 in the form of a certified

check, with notice that such sum was in payment for the 400 tons of iron due under the contract as the April, May, and June, 1917, installments, and also made demand for the delivery of the said 400 tons of iron to the plaintiff.

"On August 20, 1917, the defendant returned to the plaintiff all three checks, namely the check for $2,-696.33, the check for $555.62 and the one for $8,000, with notice that it, the defendant, declined to deliver any of the iron for which demand had been made.

"Under date of October 11, 1917, the plaintiff returned to defendant the check for $555.62, dated July 10, 1917.

"The iron called for by invoice dated February 1, 1917, being the January installment under the contract, was delivered, at the request of the plaintiff, during the months of September, October and November, 1917. This installment had been paid for and credit given May 14, 1917. No further or other deliveries of iron to apply on contract No. 687 have been made by defendant, and delivery of any iron under said contract, other than the January, 1917, installment, has been refused by the defendant.

"At no time, during the life of contract No. 687 was there any specific quantity of No. 2 'Cadillac' Lake Superior charcoal pig iron set apart in its yard by the defendant to cover this contract or any part thereof. It was the intention of the parties to the contract as modified that, when the defendant invoiced a monthly installment to the plaintiff, such invoice was notice to the plaintiff that the defendant held itself in readiness to deliver such installment on request.

"The market value of such iron as was covered by this contract, during the month of July, 1917, was $55 per ton."

Based on such finding the court reached certain conclusions of law which follow:

"1. The written contract before the court, as modified by the verbal arrangement, made in January, 1917, is in its terms a contract to sell 800 tons of No. 2 'Cadillac' Lake Superior pig iron, and is, by express terms, severable.

"2. It was the intention of the parties to this con-

tract gathered from the instrument. its modification and what was done under it as modified, that the sale of each installment should be complete, when the invoice was issued to the plaintiff by the defendant and the amount thereof charged to the plaintiff on the books.   The invoicing was notice to the plaintiff that the defendant then held the quantity of iron, called for by the invoice, in readiness to load out at the request of the plaintiff, and was a plain manifestation of an intention to appropriate such quantity of iron to the plaintiff within the meaning of the uniform sales act.   The title then passed to the plaintiff.   Nor was payment a condition precedent thereto.   By the terms of the contract the plaintiff had thirty days from the date of the invoice in which to pay for the installment, and yet delivery of the same iron was demandable at any time, even within the thirty days. There was no reservation of title till payment was made, either expressed in or implied from the instrument.

"3. Under the contract the plaintiff was to pay cash after thirty days from the date of the invoice of each and every installment.   His neglect and failure to make any payment on any of the invoices issued under dates, February 1st, March 15th, and April 21, 1917, until May 14, 1917, and then only the February 1st invoice, was material breach of the contract and justified the defendant in rescinding it in its entirety. The plaintiff is presided over by a keen business man thoroughly conversant with business ways and the usages of trade.   He must be held to have realized the fact that a credit of thirty days on each and every installment invoiced could not be reasonably construed, under a recognized trade usage, to mean a credit of 102 days on the January installment, a credit of 107 days on the February installment, and a credit of 70 days on the March installment.   He must also, from like business experience, be held to have realized that long continued outward sufferance towards a debtor does not, *ipso facto,* indicate long continued inward satisfaction on the part of the creditor.   Nor does it avail him to claim that the defendant should have made the plaintiff pay.   The legal duty rested

upon the plaintiff to pay when its obligations fell due under the contract or to make satisfactory arrangement for their extension, and not upon the defendant to urge or force it to do so.

"4. It is well settled by the authorities that an unpaid seller has the right to rescind a completed sale and retake the title to the property sold. The uniform sales act makes provision for the exercise of such right in subdivision 2 of section 61 [3 Comp. Laws 1915, § 11892], which reads as follows:

" 'The transfer of title shall not be held to have been rescinded by an unpaid seller until he has manifested by notice to the buyer or by some other overt act an intention to rescind. It is not necessary that such overt act should be communicated to the buyer, but the giving or failure to give notice to the buyer of the intention to rescind shall be relevant in any issue involving the question whether the buyer had been in default an unreasonable time before the right of rescission was asserted.'

"The act of the defendant in not issuing any further invoices of monthly installments of iron, after April 21, 1917, and the sending of the 'credit memorandum,' dated June 30, 1917, to the plaintiff under date of July 1, 1917, were overt acts within the meaning of said uniform sales act, and were sufficient to indicate to the plaintiff an intention on the part of the defendant to rescind the contract, both as to the installments where the sale must be held to have been complete as well as to those installments whereto title had not passed yet. This conclusion follows from the rule, that, where the seller is in possession of the property any dealings with it inconsistent with a recognition of the rights of the buyer in it will amount to an election. Under such condition notice to the buyer is not necessary, but in the instant case, the buyer must be held to have had notice of both overt acts, one by the presumption that it would obviously take notice of what, in the regular course of business under the contract in question, its books and records should show but failed to show, and the other by direct notice in the shape of the 'credit memorandum.'

"5. The sale of the installments for February and March was rescinded and title thereto reasserted by the defendant, but having in mind the fact that the

contract by its terms is severable, that the defendant, after its rescission of the contract accepted and applied the check for $2,660, dated July 7, 1917, in the payment of other items of indebtedness on the general account of the plaintiff than the one specifically directed by the plaintiff, and also having in mind the rule of law which gives the right to the debtor to direct the application of tendered payment, there is no inconsistency, in my judgment, in holding that, in accepting and applying said check for any purpose, the defendant must be held to have waived its right to insist on its rescission of the contract in so far as it applies to the February installment of iron, and that said February installment must be considered as paid for by said check and that the iron so covered was subject to the demand for delivery made by the plaintiff, on July 20, 1917.

"6. Judgment should be entered for the plaintiff against the defendant, under the first count of the plaintiff's declaration, in the sum of $7,315, together with interest thereon at the rate of 5 per cent. from July 10, 1917.

"7. Judgment of no cause of action should be entered under the second count in the plaintiff's declaration, and it is so ordered."

Neither party to the controversy was satisfied with the legal conclusions, the plaintiff filing exceptions to the third, fourth, that part of the fifth which reads:

"The sale of the installments for February and March was rescinded and title thereto reasserted by the defendant,"

—to the sixth and to the seventh. Defendant filed exceptions to the legal conclusions as follows:

"1. To those parts of the second conclusion of law, which read as follows:

" 'The invoicing was notice to the plaintiff that the defendant then held the quantity of iron, called for by the invoice, in readiness to load out at the request of the plaintiff, and was a plain manifestation of an intention to appropriate such quantity of iron to the plaintiff within the meaning of the uniform sales act.'

"2. To that part of the fifth conclusion of law, which reads as follows:

" 'But having in mind the fact that the contract by its terms is severable, that the defendant, after its rescission of the contract, accepted and applied the check for $2,660, dated July 7, 1917, in the payment of other items of indebtedness on the general account of the plaintiff than the one specifically directed by the plaintiff, and also having in mind the rule of law which gives the right to the debtor to direct the application of tendered payment, there is no inconsistency, in my judgment, in holding that, in accepting and applying said check for any purpose, the defendant must be held to have waived its right to insist on its rescission of the contract insofar as it applies to the February installment of iron, and that said February installment must be considered as paid for by said check and that the iron so covered subject to the demand for delivery made by the plaintiff on July 20, 1917.'

"3. To the sixth conclusion of law, which reads as follows:

" 'Judgment should be entered for the plaintiff and against the defendant, under the first count of the plaintiff's declaration, in the sum of $7,315, together with interest thereon at the rate of 5 per cent. from July 10, 1917.' "

BROOKE, J. (*after stating the facts*). Broadly speaking, the plaintiff makes the following contentions:

"(1) A completed sale was made of each of the January, February and March installments of iron and the title to such iron passed to the plaintiff.

"(2) The neglect and failure of the plaintiff to make prompt payment of the February, March and April invoices covering the quotas of iron for January, February, and March was not a material breach of the contract which justified the defendant in rescinding the entire contract.

"(3) The February installment was paid for by defendant's acceptance of plaintiff's check of July 7, 1917, for $2,660 which was directed by the plaintiff to be applied in payment of this item and therefore plaintiff was entitled to such iron upon demand.

"(4) There was no error in admitting in evidence checks and documents passing between the parties

bearing date after June 30, 1917, and in admitting testimony relative to transactions taking place after that date."

On behalf of the defendant it is contended that:

(1) The plaintiff's default in payment according to the terms of the contract clothed the defendant with the right to cancel the entire contract.

(2) That there was no completed sale of the February and March quotas.

(3) That the retention by defendant of plaintiff's check of July 7th was not a waiver of cancellation or rescission.

(4) That the letters, checks and tenders of payment since made by the plaintiff after July 1, 1917, were not material to the rights of the parties hereto and that defendant's objection to testimony relative thereto should have been sustained.

It is asserted by counsel for plaintiff that section 3 of the uniform sales act (3 Comp. Laws 1915, § 11834) provides that all sales and contracts to sell, whether verbal or written, are subject to the provisions of the act, and, based upon this assertion counsel for plaintiff seek to secure rights in the plaintiff and impose liabilities upon the defendant under the provisions of the act rather than under the terms of the contract. The contract itself, it seems to us, is very simple, and all of its terms are such as the parties had a legal right to make. The terms of the contract, therefore, must govern the rights of the parties thereunder. The statute may properly be considered in determining the bearing of the acts of the parties upon those terms. The case is somewhat peculiar in that, in essence, there is no dispute between the parties upon questions of fact. The only difference between counsel arises when legal conclusions are to be drawn from undisputed facts.

The first important question presented upon the record is in our opinion whether under the terms of

the contract and the acts of the parties in relation thereto, there was a completed sale of the January, February and March allotments of iron, the title to which as a result of the contractual relations and the acts of the parties passed from the defendant to the plaintiff. Bearing upon this question the books of the defendant show that it invoiced the January quota on February 1st; the February quota on March 15th and the March quota on April 21st and on the date of each invoice charged to the plaintiff in its regular account the contract value of each monthly quota. At the time the March quota was invoiced no payment had been made by plaintiff on the January and February quotas although both were then past due. Following the making of the invoice for the March quota on April 21st, defendant on May 1, 1917, rendered a general statement to plaintiff in the following terms:

"STATEMENT.

"CADILLAC, MICH., May 1, 1917.

"CADILLAC MACHINE CO.

"In account with

"MITCHELL-DIGGINS IRON COMPANY,

"Manufacturers

"Lake Superior Charcoal Pig Iron.

| Date. | Car No. | Invoice. | Freight. | Net. |
|-------|---------|----------|----------|------|
|       |         | Balance  |          | $5,320.00 |
| Apr. 2 | 2925 .................. | $1,120.00 | | |
| Apr. 12 | Analysis, etc.....$20.95 | | | |
| Apr. 21 | ........................ | | 2,660.00 | |
| Apr. 24 | ........................ | | 920.00 | |
| | | | | 4,700.00 |
| | | | | $10,020.00 |
| | | | | 20.95 |
| | | | | $10,040.95 |
| | Cr. | | | 20.95 |
| | | | | $10,020.00 |

Interest.

| | | |
|---|---|---|
| Jan. quota | $2,660.00 2½ Mo. 6 per cent. | $33.25 |
| Feb. quota | $2,660.00 1½ Mo. 6 per cent. | 19.95 |
| Mar. quota | $2,660.00 ½ Mo. 6 per cent. | 6.65 |

$59.85

$10,079.85"

It will be noticed in this statement that .defendant charged the plaintiff two and one-half months' interest on the January quota, and one and one-half months on the February quota and one-half month on the March quota. On May 19th after the receipt of this statement by the plaintiff, plaintiff sent to defendant and defendant credited the plaintiff with the sum of $2,660 which paid for the January quota, if interest is disregarded. For six weeks thereafter the matter stood unchanged by any act of either party except that on one or two occasions an officer of the plaintiff company suggested to an officer of the defendant company that the account should be liquidated by a payment in promissory notes in place of cash which suggestion was not complied with by defendant. On June 30, 1917, defendant issued to plaintiff a credit memorandum for $5,320, covering the February and March quotas which had theretofore been charged to plaintiff on the books of the defendant company. Immediately after the receipt of the said credit memorandum plaintiff attempted to protect its rights by the course detailed in the finding of facts. Under the terms of the contract default on the part of the plaintiff gave to the defendant the right to do one of two things: To cancel the contract, or to postpone shipments of future installments until prior shipments were paid for. So far as the record discloses the defendant availed itself of neither of the rights provided in the contract until June 30, 1917, unless its failure to invoice the quotas of April, May and June, shall be con-

strued as an intention on its part to notice plaintiff's failure to pay in accordance with the contract terms. This act so far as it has any bearing upon the rights of the parties against each other, it seems to us, indicated on the part of the defendant the intention to—

"postpone shipments of future installments until prior shipments are paid for,"

—rather than to cancel the contract. We reach the conclusion, therefore, that up to the 30th of June there was on the part of the defendant no cancellation of the contract because of plaintiff's default in payment. The authorities, as well as the provisions of the uniform sales act, are to the effect that the question of when title to property passes is one of intention to be ascertained from the terms of the contract and from the circumstances of the case. *Illinois Glass Co.* v. *Horse-Radish Co.*, 166 Mich. 520, and *Germain* v. *Loud*, 189 Mich. 38. Looking at the matter in the light of the situation of the parties and their acts in relation thereto, we think that it was the intention of both parties to the contract that the property in each monthly quota should pass from the vendor to the vendee at the time it was invoiced. As bearing upon this question it should be remembered that the character of the product sold was such that segregation from the common stock was not necessary in order to effectuate the transfer of title. Defendant was producing about one hundred tons of iron daily, a large percentage of which was of the grade covered by this contract. While it did not actually set apart in its yard—appropriate—133 tons of iron each month to cover the invoices to plaintiff, it nevertheless had agreed so to do and it had rendered to plaintiff, on May 1st, a statement of account in which it had charged plaintiff with interest on the overdue payments for such invoices. This course followed by the

defendant at a time when plaintiff was in default was wholly inconsistent with an assertion of its right to cancel under the contract for such default. It was, in effect, an affirmance of the sale and a notice to plaintiff of its abandonment of its right to cancel for such default as had occurred up to that time. Thereafter, and on the 19th day of May, it credited plaintiff with $2,660 upon the contract although the payment was long overdue. This act, too, is not without significance when the situation of the parties at that time is considered.

We are unable to find anything in the record touching the acts of the plaintiff with reference to the contract which tends to indicate on its part abandonment or the desire to be released from the legal obligations imposed thereby. Plaintiff had some difficulty in financing the payments as they matured of which defendant was advised. Such a situation, however, arises not infrequently in commercial affairs and of itself affords no ground for cancellation. Plaintiff's failure to pay according to the contract terms was a ground for cancellation, as to the January and February quotas; this remedy, however, was not invoked by defendant.

We now come to a consideration of the effect of the credit memorandum issued by defendant to plaintiff on June 30th. In the light of the acts of the parties with reference to the account up to that time we are of the opinion that the issuing of this credit memorandum was ineffectual to change the rights of the plaintiff as they had theretofore been fixed with reference to the January and February quotas. While the act in itself was perhaps equivocal it seems to us that it can only be fairly construed as an attempt on the part of the defendant to notify the plaintiff that it considered itself relieved from any further obligation under the contract, and that it was cancelled.

Whether this is true or not it is undisputed that on July 10th the parties in interest had an interview at which it was made clear to plaintiff's representative that defendant considered the contract cancelled. This notice, like the credit memorandum, could not affect the rights of the parties with reference to the first two quotas which had become fixed. What effect did it have upon plaintiff's rights under the contract to the March, April, May and June quotas? The contract recites:

"If shipment is made in installments, this contract for all purposes shall be treated as separate for each installment."

On behalf of the plaintiff it is asserted that inasmuch as the contract, as modified, provides that invoices for each month's quota should be issued and as defendant never invoiced the quotas for April, May and June, there was on the part of the plaintiff no default as to those quotas and therefore no right on the part of the defendant to cancel, growing out of a failure to pay for those quotas. It is further urged that this being a sale of goods by installment the seller cannot rescind or refuse performance unless the buyer's default is made under such circumstances as justifies an inference that he repudiates the entire contract, citing *West* v. *Bechtel*, 125 Mich. 144 (51 L. R. A. 791), and *Welsh* v. *Michigan Maple Co.*, 161 Mich. 16. The difficulty with this position is that the contract provides for more than a mere sale of goods by installment. It preserves definitely in the vendor the absolute right of cancellation:

"If the buyer fails to make payment when due."

In neither of the cases cited did the contract contain any such provisions. Leaving out of the question plaintiff's default as to the April, May and June quotas, it was nevertheless clearly in default on the March

quota, when on July 10th the contract was definitely repudiated by the defendant. We are unable to see how the provision that:

"This contract for all purposes shall be treated as separate for each installment,"

—deprives the defendant of its right to cancel. This language must be read in conjunction with the earlier provision of the contract providing for cancellation of the contract or postponement of shipment of future installments. It is true that because of its own acts such cancellation cannot be made effective as to the February quota, but we can see no reason why the plaintiff's default as to the March quota cannot be made the basis of a valid cancellation as to the balance of the contract. Defendant's acts in billing for the three quotas, January, February and March on May 1st and adding interest thereto and subsequently crediting defendant with $2,660 on May 14th while conclusive as we have seen against defendant's contention as to the February shipment cannot affect its rights as to the March shipment because at that time no default as to said March shipment had occurred. Under our view of the case plaintiff is entitled to recover by reason of the failure of defendant to deliver the February quota, but cannot recover for failure to deliver the March, April, May and June quotas because the defendant cancelled the contract for a valid reason on or about July 10th. This conclusion renders it unnecessary to consider the question of the misapplication of payment by plaintiff to defendant of the $2,660 on July 7th because whether applied to the February quota or not plaintiff would be entitled to recover for that shipment.

The judgment is affirmed.

BIRD, C. J., and OSTRANDER, MOORE, STEERE, FELLOWS, STONE, and KUHN, JJ., concurred.