(No. 19262.

THE STERLING-MIDLAND COAL COMPANY, Defendant in Error, *vs.* THE GREAT LAKES COAL AND COKE COMPANY, Plaintiff in Error.

*Opinion filed February 20, 1929—Rehearing denied April 16, 1929.*

WINSTON, STRAWN & SHAW, (SILAS H. STRAWN, J. SIDNEY CONDIT, GRIER D. PATTERSON, CHARLES J. CALDERINI, and M. OGDEN WEST, of counsel,) for plaintiff in error.

JOHN J. SHERLOCK, and HAIGHT, ADCOCK & BANNING, for defendant in error.

Mr. JUSTICE HEARD delivered the opinion of the court:

Defendant in error, the Sterling-Midland Coal Company, (hereinafter called plaintiff,) brought suit in assumpsit in the municipal court of Chicago against plaintiff in error, the Great Lakes Coal and Coke Company, (hereinafter called defendant,) and upon a trial recovered a judgment for $31,047.55, from which judgment an appeal was taken by defendant to the Appellate Court for the First District, which court affirmed the judgment. A writ of *certiorari* to review the record was allowed by this court at the October, 1928, term.

Plaintiff claimed for money due for various quantities and kinds of coal sold and delivered to defendant pursuant to certain written contracts between them. There is no controversy between the parties as to the amount due from defendant to plaintiff therefor. Defendant pleaded a setoff, alleging the making of two written contracts for the sale of coal by defendant to plaintiff and that plaintiff failed and refused to accept delivery of approximately 105,640 tons of coal contracted for, and asked for damages based upon the difference between the contract and market prices of this shortage, amounting to $73,948.

The Black Servant Coal Company operated what is known as a "strip mine" in Elkville, Jackson county, Illinois. On March 26, 1924, it entered into a written contract with the H. S. Odbert Coal Company for the sale of coal to be shipped from this mine at a price of $1.20 per ton for a period beginning April 1, 1924, and ending March 1, 1925. This contract contained the following provision:

"*Quality*—All coal shall be clean, well prepared and reasonably free from bone, slate, soapstone, shale, fire-clay, sulphur and other non-combustible impurities. Coal is guaranteed to analyze not more than fifteen per cent ash, dry basis, and not less than 11,000 British thermal units, as received."

On the same date the Odbert Coal Company made a contract in writing whereby it agreed to sell, and the defendant agreed to buy, the same coal. With the exception of the names of the parties and the price the contracts were identical and contained identical stipulations as to the quality of the coal to be delivered. An analysis of this coal made on March 27, 1924, disclosed an ash content of 17.24 per cent.

George Skakel, of the defendant company, about this time, on behalf of the defendant, opened negotiations for the sale of coal to plaintiff. On April 4, 1924, as a result

of these negotiations, the parties hereto entered into a contract containing, among others, the following provisions:

"Great Lakes Coal and Coke Co., an Illinois corporation, hereinafter termed the seller, agrees to sell, and the Sterling-Midland Coal Co., an Illinois corporation, hereinafter termed the buyer, agrees to buy, coal of the kind, quality, size and description and at the prices and upon the terms herein below set forth.

"*Kind*—Coal to be shipped from the stripping property of the Black Servant Coal Co., located at or near Elkville, Jackson county, Illinois, on the Illinois Central railroad.

"*Quantity and Rate of Shipment*—Thirty cars per week at a rate of approximately five cars per day.

"*Size*—Screenings which have passed through the perforation of a round-hole screen the diameters of which shall not be less than $1\frac{1}{4}''$ nor more than $2''$, at the option of the seller. In event that seller is unable to ship screenings at the rate shown herein, he is to make up any deficiency by crushing mine run or other sizes so that the coal, after passing through the crusher, will pass through the perforations of round-hole screens the diameters of which shall not be less than $1\frac{1}{4}''$ or more than $2''$.

"*Terms of Payment*—Cash on or before the 20th of month following shipment. If the credit of the buyer shall at any time, in the judgment of the seller, become impaired, the seller reserves the right to require satisfactory security from the buyer before making further shipments. Time of payment is of the essence of this contract. Failure to pay according to terms hereof shall give the seller unrestricted right, without other demand or notice, to rescind this contract and to proceed to demand and collect all amounts due for coal previously sold and delivered under this contract. No waiver shall be held to arise from failure of the seller to exercise this right.

"*Weights*—Weights obtained by the railroad company at initial weighing station shall govern settlements.

"*Remarks*—Coal is to be consigned to the Western Electric Co., Chicago.

"*Price*—$1.50 per ton f. o. b. car mines, Elkville, Illinois.

"*Conditions Affecting Contract*— * * * It is further understood that during any period of time when seller's receipts of coal of the character specified shall be reduced but not wholly terminated by strikes, lock-outs, delays, shortage of cars, or by failure or other contingencies of transportation, shortage of labor or material caused by war, insurrections or riots, floods, acts of Providence, accidents or other causes beyond its control, the seller shall have the right to furnish to the buyer such proportion, only, of the coal of said character then actually available for delivery by

the seller as the maximum daily amount of such coal hereby contracted for bears to the contracts or obligations for such coal held by the seller. * * * There are no understandings or agreements relative to this contract or its subject matter that are not fully expressed herein.

"This contract shall take effect on the 14th day of April, 1924, and shall continue in force until and including the 31st day of March, 1925.

"In witness whereof the parties hereto have executed this agreement in duplicate on the 4th day of April, 1924.

GREAT LAKES COAL & COKE CO.,
By George Skakel.
STERLING-MIDLAND COAL CO.,
By W. J. O'Brien."

On April 23, 1924, a similar contract was entered into for the sale of eighteen to thirty cars per week, at the seller's option, at a price of $1.50 per ton. These two contracts were exactly alike with the exception of the quantity and rate of shipment. Coal was delivered by defendant to plaintiff under these contracts from time to time until about August 25, when plaintiff notified defendant that it would not take any more of the coal. Payment was made by plaintiff to defendant for all coal which was delivered under the contracts. The Western Electric Company was one of the largest customers of plaintiff and the coal sold to plaintiff was consigned to that company. In July, 1924, the Western Electric Company complained to plaintiff of the quality of the coal delivered, and from that time until the latter part of August numerous complaints were communicated to defendant.

The cause was tried by the court and findings of fact and propositions of law were submitted. The trial court, over the objection of defendant, permitted the introduction of parol evidence tending to show the purpose for which the coal was bought, that there was an express warranty of the quality, and also parol evidence tending to show that the sale was induced by sample. As the coal offered was undoubtedly of the size and from the particular mine

described in the contracts, it is apparent that the controlling question in the case is whether the court erred in admitting this parol evidence.

At the request of defendant the court held that it is the law that when a written contract of sale upon its face is couched in terms such as import a legal obligation, without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking have been reduced to writing. This proposition was marked by the court as "held," with the statement, however, that it was not applicable. The court held as a matter of law that the contracts between the parties dated April 4 and April 23, 1924, were, respectively, incomplete, and that parol evidence not inconsistent with the contracts was admissible to show the real intent of the parties thereto. The court also held as a matter of law that parol evidence was admissible to show the quality of the coal purchased by plaintiff on the contracts between the parties dated April 4 and April 23, 1924; also, that parol evidence was admissible to show the purpose for which the coal was purchased by plaintiff under these contracts. Upon the facts the court held that plaintiff made known to defendant the particular purpose for which the coal in question was required and that plaintiff relied on defendant's skill or judgment, and that various installments of coal furnished by defendant to plaintiff in the months of July and August, 1924, were not suitable for the particular purpose for which the goods were required; further, that plaintiff did not receive the quality of coal bargained for under the contracts between the parties.

It is the contention of defendant that since these contracts were complete, and include, as it asserts, a definite description of the quality of the coal in question, the court erred in admitting parol testimony tending to show that a sample of the coal had been taken prior to the execution

of the contract; that defendant had been informed of the purposes for which the coal was desired and that there had been express warranties as to its qualities. In *Telluride Power Co.* v. *Crane Co.* 208 Ill. 218, it is said: "The rule is, that when the writings show, upon inspection, a complete legal obligation, without any uncertainty or ambiguity as to the object and extent of the engagement, it is conclusively presumed that the whole agreement of the parties was included in the writings. The fact that a point has been omitted which might have been embodied therein will not open the door to the admission of parol evidence in that regard. * * * The rule is too well recognized to require citation of authorities that all preliminary negotiations, whether oral or written, are merged in the written contract."

It is contended, however, by plaintiff that the above rule does not apply where the written contract is not complete in itself, and that in the instant case the written contract is not complete as the quality of the coal is not specified, and that by reason of the fact that the coal contracted to be sold to plaintiff was the same coal that the Odbert Coal Company contracted to sell to defendant and the contract between defendant and the Odbert Coal Company contained the paragraph headed "Quality," the omission of a similarly headed paragraph rendered the contracts between plaintiff and defendant incomplete. This contention is based upon false premises. The written contract does not call for the sale and delivery by defendant to plaintiff of the same coal purchased by defendant from the Odbert Coal Company. The Odbert Coal Company was not the sole owner of the output of the mine of the Black Servant Coal Company, and the evidence shows that the weekly output of the mine was sufficiently great to have enabled defendant to fill its contract with plaintiff without using any of the coal purchased by defendant from the Odbert Coal Company. Even if the contract between defendant and

plaintiff had been for the same coal purchased by defendant from the Odbert Coal Company, it by no means follows that because the Odbert Coal Company warranted its coal to defendant, defendant was legally bound to warrant that same coal to plaintiff when selling it. There is no law which requires a person who purchases goods under a warranty to warrant the same when making a re-sale. In the instant case, evidence introduced by plaintiff shows that it would have been folly for defendant to have inserted in its contract with plaintiff the same warranty contained in defendant's contract with the Odbert Coal Company, for the reason that, prior to making the contract with plaintiff, tests of the Odbert coal made by defendant showed a seventeen per cent ash content, and the evidence on the part of both contracting parties is to the effect that a guaranty similar to that contained in the Odbert contract was intentionally omitted from the contracts between plaintiff and defendant. The written contracts in question are not incomplete in not specifying the quality of the coal. There is nothing in the contract where the word "quality" is used to indicate that it was the intention of the parties that there should be a separate clause specifying the quality of the coal to be delivered. "Quality" is defined in Webster's New International Dictionary as follows: "1. In the most general sense, that which serves to identify any subject in the respect in which it is considered. 2. That from the possession of which anything is such as it is; a property, characteristic, attribute or predicate. Physical qualities were divided by Locke into the primary qualities, or bulk, figure, number, situation, and motion or rest, and the secondary qualities, or such as he held are produced by bodies indirectly, as tastes, sounds, colors, etc." In 32 Cyc. 1281 a definition given of the word "quality" is: "The condition of being of such a sort as distinguished from others." An examination of the contracts in question shows that they do contain specifications as to the quality of the coal for

which the contracts were made. The coal was to be screenings (described in detail) from the stripping property of the Black Servant Coal Company located at or near Elkville, Jackson county. The terms of the contracts would be fulfilled by the delivery of any screenings from this stripping property which would pass through the perforations of a round-hole screen the diameters of which should not be less than $1\frac{1}{4}$" nor more than $2$", at the option of the seller, as it is provided: "In event that seller is unable to ship screenings at the rate shown herein, he is to make up any deficiency by crushing mine run or other sizes so that the coal, after passing through the crusher, will pass through the perforations of round-hole screens the diameters of which shall not be less than $1\frac{1}{4}$" nor more than $2$"." Plaintiff was not compelled to enter into the contracts in question. Had it desired at that time a more specific description of the quality of the coal contracted for it could have insisted on the insertion of such specifications in the contract and have refused to enter into the same if such specifications were not inserted. The contracts having contained some specifications as to quality, plaintiff can not now be heard to complain that the contract was not complete in that respect.

The construction which we have placed upon the contracts is not only in accordance with the rules for the construction of contracts generally, but is in accord with the general custom shown by the evidence to have been prevailing among coal men at the time and place the contracts were entered into, and that according to such general custom the contracts are complete and that to coal men they contain a definite description of the quality of the coal bought and sold thereunder. Where a person deals in a particular market he must be taken to deal according to the known general or uniform customs or usages of that market. (*Eau Claire Canning Co.* v. *Western Brokerage Co.* 213 Ill. 561.) Where no particular stipulations are

made to the contrary, contracts made in the ordinary course of business are presumed to be made with reference to any existing usage or custom relating to such trade, and it is always competent to resort to such usage or custom to establish and fix the terms of the contract. *National Importing Co.* v. *Bear & Co.* 324 Ill. 346; *El Reno Grocery Co.* v. *Stocking,* 293 id. 494; *DeStefano* v. *Associated Fruit Co.* 318 id. 345.

While it is the general rule that in construing a contract it is proper for the court to take into consideration the surrounding circumstances, this does not give to either party the right to establish by oral evidence a different contract from that expressed in the written agreement. All conversations and parol agreements between the parties prior to the making of their written agreement are merged in the writing and cannot be proved for the purpose of changing the contract or showing an intention different from that expressed. If a written contract purports on its face to be a complete expression of the whole agreement it is to be presumed that the parties introduced into it every material item and term, and parol evidence is not admissible to add another term to the agreement about which the contract is silent. *Armstrong Paint Works* v. *Can Co.* 301 Ill. 102.

It is contended by plaintiff that by reason of the provisions of sections 15 and 16 of the Uniform Sales act there was an implied warranty of the quality of the coal contracted for. The rights, duties and liabilities arising under and by virtue of the implied warranty mentioned in sections 15 and 16 arise by implication of law and not by contract. By section 71 of the same act it is provided: "Where any right, duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract or the sale."

In *Minnesota Threshing Machine Co.* v. *Hocking,* 54 N. D. 559, 209 N. W. 996, the contract for the sale of a threshing machine expressly provided that there were no agreements "other than contained herein." The defendant sought to establish the implied warranty of fitness for a particular purpose under section 15 of the Sales act of that State. The court said: "The Uniform Sales act is not intended to be a restriction upon the rights of parties to contract. It is simply a statement of the rules applicable in the construction of such contracts as may be made. It does not contract for the parties. It measures their rights under the contracts they themselves make. It does not purport to create a mold in which all such contracts must be cast. There is nothing contained within its provisions which can be said to prohibit the inclusion of any lawful term that the parties may desire in a contract for sale, nor is there anything therein contained which can be said to avoid any lawful term or provision that may be thus mutually agreed upon. (See section 71 of the Sales act; *Renne* v. *Volk,* (Wis.) 205 N. W. 385; *Hunt* v. *Hurd,* 205 Mich. 142, 171 N. W. 373; *Cadillac Machine Co.* v. *Mitchell-Diggins Iron Co.* 205 Mich. 107, 171 N. W. 479. See, also, *Minneapolis Steel and Machinery Co.* v. *Casey Land Agency, supra.*) We therefore hold that, the parties to the contract here in question having by express terms negatived and excluded all implied warranties, the defendant cannot claim the benefit of any such as might have been available had the contract not done so."

In the instant case any such rights, duties or liabilities which would arise by implication of law are specifically negatived by the provisions which each contract contains, "there are no understandings or agreements relative to this contract or its subject matter that are not fully expressed herein." All contracts are presumed to have been entered into not only with reference to the general customs and usages of the trade, but with reference to the provisions

of the statutory law applicable thereto, and when not nega-
tived it must be held that it is one of the understandings
of the parties to the contract for sale that sections 15 and 16
of the Uniform Sales act will apply. The clause of the
contract just quoted not only negatives the fact that there
are any contemporaneous parol understandings or agree-
ments existing between the parties relative to the contract,
but also expressly negatives the fact that there are any
understandings, whether arising by implication of law or
otherwise, between the parties as to the subject matter of
the contract,—*i. e.,* as to the coal itself which is the subject
matter of the contract. This clause of the contract is just
as binding upon the parties as any other clause and the
municipal and Appellate Courts had no right to disregard
it. All the parol evidence introduced on behalf of plain-
tiff which tended to establish a sale of the coal by defend-
ant to plaintiff for the specific purpose of filling the needs
of the Western Electric Company, a customer of plaintiff,
to prove an express parol warranty outside of the terms of
the written contracts relative to the quality which the coal
should have, and the breach of such warranty, and to show
the existence of a sale by sample to plaintiff and a breach
of the implied warranty which is raised by such a sale un-
der the Uniform Sales act, was incompetent.

It is contended by plaintiff that as this cause was tried
by the court without a jury, the court would be presumed
to have disregarded all incompetent evidence and to have
based its findings and judgment only upon the competent
evidence, and that this court is bound by the findings of
fact of the Appellate Court and can only here consider
questions of law. Such findings of fact, however, can be
inquired into in this court where there is no evidence in
the case upon which to base the findings. (*Toffenetti* v.
*Mellor,* 323 Ill. 143.) Where a trial is had before the
court without intervention of a jury, errors in the admis-
sion of evidence, if they exist, do not require a reversal

where there is in the record competent evidence to justify the finding of the court. (*Merchants' Despatch Transportation Co.* v. *Joesting,* 89 Ill. 152; *Pratt* v. *Davis,* 224 id. 300.) In the instant case, however, there is no competent evidence to justify the finding of the court. The uncontradicted evidence showed the making of the contracts, the breach thereof by plaintiff, the readiness, willingness and ability of defendant to supply the coal to plaintiff, and damage resultant to defendant by reason of plaintiff's breach of the contracts. The record shows that both the trial and Appellate Courts entirely disallowed defendant's claim for damages, and that there was no competent evidence in the record upon which to base the judgment of the municipal court.

The judgments of the Appellate and municipal courts must therefore be reversed and the cause remanded to the municipal court.                    *Reversed and remanded.*