**STOLTEBEN v. GENERAL FOODS CORPORATION.**

Civ. 36–157.

District Court, S. D. New York.

Feb. 20, 1948.

Pruitt, Hale & Coursen, of New York City (H. Preston Coursen, of New York City, and Francis J. Naphin of Chicago, Ill., of counsel), for plaintiff.

Lester E. Waterbury, of New York City (Lester E. Waterbury and Arthur D. Wingebach, both of New York City, of counsel), for defendant.

GODDARD, District Judge.

This action by the plaintiff, a resident of Illinois, is brought against the defendant, a Delaware corporation, to recover damages sustained for alleged breach of a contract by the defendant to purchase 153,500 laminated water-proof bags [later referred to as "Triplex bags"]. It was tried before the court without a jury.

In the complaint it is alleged that an agreement for the purchase of the bags was entered into on or about April 16, 1945, and that the contract is contained in certain writings, copies of which are attached to the complaint, which further alleges that prior to the time specified for the delivery of the bags and on or about August 1, 1945 defendant notified plaintiff that it would not accept or pay for them and that by reason of the alleged breach, plaintiff has been damaged in the sum of $37,556.74.

Defendant, in its amended answer in addition to a general denial, alleges as a first defense, that, during the period from April 16, 1945 to August 1, 1945 plaintiff and defendant negotiated with respect to the terms of an order for bags to be supplied to defendant by plaintiff for use in packing breakfast cereals for the armed forces, as more particularly set forth in Exhibits A to I inclusive annexed

to the amended answer; and it is further alleged that it was mutually understood that the order for bags was a pro forma and tenative order only, issued in anticipation of the award to the defendant of a government contract for breakfast cereals for the fourth quarter of 1945, and was placed with plaintiff by defendant solely for the purpose of reserving a place in plaintiff's manufacturing schedule; that said order was not to become binding upon plaintiff or defendant on April 16, 1945, or at any other time, unless and until such award was made; and that no award was made as plaintiff well knew. The Second, Third and Fourth defenses are affirmative defenses of illegality and allege the failure of plaintiff and his supplier of bags, the Mehl Manufacturing Company, to comply with certain orders and regulations of the War Production Board in placing and accepting orders for Triplex bags and for Triplex paper used in their manufacture. However, no proof was offered on the trial to support these defenses of illegality.

During the late war cereal breakfast food for the armed forces on the Islands in the Pacific frequently had to be carried or floated ashore through the surf and the Army required suppliers of these foods to pack them in what were called "shipper bags". These were pillow-case shaped and water proof; they were made of creped Kraft paper laminated with asphalt. Those with three layers of paper were called "Triplex bags"; those with two layers of paper—"Duplex bags".

The need for bags was urgent and due to the general shortage of paper difficult to obtain. About the middle of 1943 plaintiff, who was and for some time had been engaged in business in Chicago as a consultant on packing materials and in the purchase and resale of such materials under the name of "Package Products Company" was requested by Major Clark [later Lieutenant Colonel] to assist the army in finding further sources for the production of these bags. Plaintiff who had previous business with the Mehl Manufacturing Company Division of Sidney-Thomas Corporation [referred to later as Mehl] of Cincinnati, thought that Mehl might be able to manufacture the bags if it could obtain the paper and laminated material. Major Clark and plaintiff arranged with the Ruberoid Company to manufacture the laminated material if the necessary Kraft paper could be obtained and Major Clark, through the War Production Board, had Kraft paper allocated to Ruberoid by Tomahawk Paper Mills [referred to later as Tomahawk]. The bags were to be supplied only to manufacturers supplying foods to the Chicago Quartermaster's Depot. Under the arrangement Tomahawk would furnish Ruberoid with Kraft paper; Ruberoid would provide the laminated material and produce the Duplex or Triplex paper and send it on to Mehl who would make the bags.

General Foods, beginning January, 1944, obtained from the plaintiff bags for packing the cereals it was furnishing the Army under contracts. Prior to 1945 the contracts for the cereals called for prompt shipping, but commencing with shipments to be shipped during the third quarter of 1945 the Army Quartermaster's orders were on a calendar quarter basis.

General Foods manufactured and packed the cereals at its plant in Battle Creek, Michigan. Packing materials were ordered in part by its purchasing department in New York and part by Claude M. Lewis, its representative in Battle Creek. But the purchases of outer cases were handled by the New York office. In the latter part of March, 1945 Lewis received a copy of a purchase order entered into by the New York office for 153,500 outer cases which had been placed by the New York office after talks with the Quartermaster about a fourth-quarter contract. Lewis talked with plaintiff by telephone and asked if he could supply 153,500 Triplex bags in equal quantities in September, October and November, 1945. After this conversation several written communications passed between Lewis and Stolteben, which the plaintiff alleges constituted his contract with General Foods. These read as follows:

Exhibit I

"April 16, 1945

Package Products Company
221 N. LaSalle St.
Chicago, Ill.

Att. Mr. J. Stalteben

Gentlemen:

Attached hereto our order No. 48368 covering fourth quarter bags. This order

is being placed to give you an opportunity to place these bags in your schedule and we are reserving cancellation or change privilege up to 30 days prior to specified delivery date.

Yours very truly,
General Foods Corporation
By: C. M. Lewis,
Asst. Purchasing Agent

CML*M"

# GENERAL FOODS CORPORATION
## PURCHASING DEPARTMENT

Package Products Co.,
221 N. LaSalle St.
Chicago, Ill.

EXHIBIT
U. S. Disc. Court
S. D. of N Y
OCT 20 1947

POST PRODUCTS DIVISION
Battle Creek, Mich.

April 16, 1945.

Please enter our order for articles listed below at the prices terms and conditions specified herein, including the conditions printed on back hereof. Acknowledge receipt of this order promptly and state when you will ship. SEND INVOICES IN DUPLICATE.

ORDER NO. 48368     SHIP VIA   Freight      YOUR QUOTATION

F. O. B.   Battle Creek, Mich.        TERMS   30 days net, 1%-10 days.

| QUANTITY | ARTICLE | PRICE |
|---|---|---|
| | The following NewTriplex Bags, complying with Chicago Q.M. Depot Spec. 175 dated March 9, 1944: | |
| 76,500 -- | T-200 -- 32-1/2" X 39" -- 32-1/2" open @ | $341.00 M |
| 38,500 -- | GF-200 - 32" X 35-3/4" -- 32" open - @ | $305.45 M |
| 23,000 -- | BF-200 - 28-1/8" X 34-3/4" - 28-1/8" open - @ | $278.30 M |
| 15,500 -- | G-200 -- 24-1/2" X 26-3/4" - 24-1/2" open - @ | $221.00 M |

Approximately one third above quantity of each item for delivery in September, one third October, one third November, 1945.

These bags will be used exclusively for packing cereal on contract with Chicago Q.M. Depot and preference rating AA-2-X is being assigned.  Government contract number will be extended upon receipt, together with any change in preference rating.

We reserve the option of canceling or revising above quantities or sizes as required by Government contract at any time up to 30 days prior to delivery date.

CML*M
3 R/M Bags for Gov't. Contract

This order is placed with the understanding, that you will certify as follows on your invoice to us:
We guarantee that the merchandise covered by this invoice is priced in accordance with government price ceiling regulations.

GENERAL FOODS CORPORATION
By

Exhibit 3

"April 17, 1945

General Foods Corporation,
Post Products Division
Battle Creek, Michigan
Attention: Mr. C. M. Lewis
Dear Mr. Lewis:

We are in receipt of your order No. 48368 covering your requirements of Triplex bags for the fourth quarter of this year.

While we have entered this order in the regular way with the mill, subject to one third deliveries each during September, October and November, 1945, such filing is only for purposes of scheduling these bags in the respective months mentioned.

There may be some question concerning your provision of cancellation at any time within thirty days of delivery, since our industry is required to specify paper requirements cut-to-size, a full 60 days in advance of delivery, without privilege of cancellation.

We are attempting to establish some means of protection in the event of sudden Government cancellations, and we will have to withhold formal acknowledgment of your order until such cancellation specifications have been clearly defined, in protection to the interests of all parties concerned in the manufacture of such material.

We do appreciate the additional business however, and are sure that some amiable arrangement can be made, whereby our mutual interests are protected.

Yours very truly,
Package Products Company
J. Stolteben

JS/b"

Exhibit 4

"April 21, 1945

General Foods Corporation
Post Products Division
Battle Creek, Michigan
Attention: Mr. C. M. Lewis
Dear Mr. Lewis:

Further in regard to your order No. 48368 calling for a total of 153,500 Triplex bags of four sizes, it appears that we shall be obliged to adopt the standard terms of cancellation as provided by the Government, in which protection is provided to all supply contractors, covering any commitment they may have made for raw materials.

We find, that in addition to the 60-day period required of us in specifying paper widths and quantities to be combined, and additional 30 days is required by the combiner in placing his commitments for the raw kraft paper which is used.

You are perhaps familiar with the standard contract clauses approved by the Government, governing raw materials in work, or committed for, and with your approval, we will acknowledge your order formally, including such standard terms.

In all probability, we shall adopt use of this clause hereafter where government contract material is involved, on all formal acknowledgments for such orders. Would this procedure be agreeable to you covering your order No. 48368?

We will await further advice from you.

Yours very truly,
Package Products Company
J. Stolteben

JS/b"

Exhibit 5

"April 27, 1945

Mr. J. Stolteben
Package Products Co.,
221 N. LaSalle St.
Chicago, Ill.

Re: Our order 48368

Dear Mr. Stolteben:

Referring to your letter of April 21st regarding cancellation date for above order, as we understand your letter, we would be required to notify you in June or 90 days preceeding estimated delivery date.

We believe that for protection of all concerned, we should let this order stand and by June we should have definite information with Government contract numbers, therefore acknowledgment of this order with 90 day cancellation provision is in order.

Yours very truly,
General Foods Corporation
By: C. M. Lewis
Asst. Purchasing Agent

CML*M"

MANUFACTURERS · DISTRIBUTORS
PACKAGING MATERIALS

**EXHIBIT** STATE A186
U. S. Dist. Court
S. D. of N. Y.

## PACKAGE PRODUCTS COMPANY 20 1947

**221 NORTH LA SALLE STREET** CHICAGO I, ILL.

RECEIVED
MAY 4 1945
Post Products Division of
General Foods Corporation
Battle Creek

Date **May 3, 1945.**

To: General Foods Corporation,
Post Products Division,
Battle Creek, Michigan
Att: Mr.C.M.Lewis

Our Order No. A-1594
Your Order No.#48368
Ship 1 3 ea.,Sept.,
F.O.B. Oct., & Nov.
Battle Creek
Terms 1-10,-30 net,DOI

*We are pleased to acknowledge receipt of your order which we have entered as follows, subject to conditions below:*

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 76,500 | (T-200) Size 32½" x 39" (Open 32½") | 3Q.00 M. | |
| 38,500 | (GF-200) " 32" x 35½" ( " 32" ) | 305.45 M. | |
| 23,000 | (B-200) " 28-1/8" x 34¾" ( " 28-1/8") | 278.30 M. | |
| 15,500 | (G-200) " 24½"x 26¾" ( " 24½" ) | 221.00 M. | |

This order is acknowledged subject to a 90-day
cancellation or revision clause, instead of
the 30-day clause as shown on your order #48368.

# ACKNOWLEDGEMENT

CONDITIONS

1. We will do our utmost to fill orders within time promised, but will not be held responsible for delays due to causes beyond our control.
2. Orders once accepted by us are not subject to cancellation or change without consent in writing between purchaser and ourselves.
3. Purchaser must notify us within 5 days after receipt of goods in regard to any claims whatsoever.
4. All freight deductions are made conditional on surrender to us of the paid freight bill.

The defendant's contention is that it was a tentative order subject to the receipt by the defendant of a Government contract for the fourth quarter. Lewis testified that prior to sending plaintiff the letter and order of April 16, 1945 in a telephone conversation with plaintiff, Lewis said—

"I told Mr. Stolteben that there was talk in New York between the Quartermaster and our New York Government department of a fourth-quarter contract for cereals; that we had no contract at that time and had no intimation of the quantity but New York had decided that as a stab in the dark they would use approximately the same quantity as we used in the third quarter. I asked Mr. Stolteben if he thought he could deliver approximately those quantities in the months of September, October and November of 1945. He thought he could."

"I told Mr. Stolteben that we had no assurance of an order; we were merely attempting to anticipate a quantity; we did not know what the delivery date would be —what the delivery dates would be, but we were dividing the total amount by three and estimating they would want approximately a third of it a month."

"I told Mr. Stolteben we had no Government contract, and I believe in that conversation he said 'How are we going to get paper if we don't have a Government contract? And I said—'Well, you wont have to get paper until we get a Government contract'. And I believe he said 'You send your order along and we will do the best we can for you.'"

Mr. Lewis then added—"I told Mr. Stolteben—he said 'You send your order along, and we will do the best we can', and I said 'Jack, these orders will have to be very indefinite and uncertain due to the fact that we have no Government contract. We cannot give you definite quantities; cannot give you definite shipping dates, but accept these and if and when the Government contract is received, they will be adjusted.'"

The plaintiff does not deny that there was a conversation but urges that Mr. Lewis' recollection is incorrect and there was nothing said about his order being subject to General Foods obtaining a contract from the Government, and counsel for plaintiff objected to Lewis' testimony as an attempt to vary the terms of the written contract on a subject which has been specifically covered in the written contract and inadmissible as a violation of the parol evidence rule. The court reserved decision on plaintiff's motion to strike from the record Lewis' testimony as to the alleged conversation. The initial written communication Lewis sent to Stolteben reads in part " * * * Attached hereto our order No. 48368 covering fourth quarter bags. This order is being placed to give you an opportunity to place these bags in your schedule and we are reserving cancellation or change privilege up to 30 days prior to specified delivery date."

In the attached order blank it is stated "We reserve the option of cancelling or revising above quantities or sizes as required by Government contract at any time up to 30 days prior to delivery date." [Exhibits 1 and 2].

At the trial, when asked upon cross examination why he had inserted this cancellation clause, Lewis said it was to provide protection against liability since General Foods did not have, as yet, a Government contract. It is to be noted that in both these communications the distinction between "cancellation" and "revising" is observed.

The provisions in respect to cancellation and in respect to revision of specifications were specifically inserted by Lewis for the protection of General Foods, and it is quite apparent that he intended to protect General Foods by providing for cancellation within the specified period against the contingency of the failure of the Government to finally award the contract to General Foods; also with the reservation as to possible changes in Government specifications. It is also evident from plaintiff's reply to Lewis' letter that plaintiff was under the impression that the protection clause inserted by Lewis was to cover the possibility of General Foods not obtaining the Government contract. Plaintiff's reply reads in part—"While we have entered this order in the regular way with the mill * * * such filing is only for the purposes of scheduling these bags in the respective months mentioned."

The letter goes on to give the reasons why Stolteben only filed the order tentatively, saying—"There may be some question concerning your provision of cancellation at any time within thirty days of delivery, since our industry is required to specify paper requirements cut-to-size a full 60 days in advance of delivery, without privilege of cancellation. We are attempting to establish some means of protection in the event of sudden Government cancellations, and we will have to withhold formal acknowledgment of your order until such cancellation specifications have been clearly defined, in protection to the interests of all parties concerned in the manufacture of such materials * * *".

Plaintiff confirmed his position in another letter to Lewis saying that he would require the provision respecting cancellation privilege to follow the standard cancellation clause used by the Government and would await Lewis' acceptance of it before accepting the order. In reply Lewis wrote— " * * * As we understand your letter, we would be required to notify you in June or 90 days preceeding estimated delivery date. We believe that for the protection of all concerned we should let this order stand and by June we should have definite information with Government contract numbers, therefore acknowledgment of this order with 90 days cancellation provision is in order."

Plaintiff soon after acknowledged the order with the 90 day cancellation clause.

The insertion of the cancellation clause by Lewis and the communications which passed between them in respect to cancellation certainly justifies the conclusion that each of them regarded it as the protection for General Foods in the event the Government contract did not materialize. The defendant contends that even though this protection clause is in the written contract, there was another condition, namely—that the defendant obtain a Government contract.

It does not seem likely that they would have debated at length over the protection specified in the written contract and omitted any reference to such a vital feature as that it was conditioned upon General Foods securing the Government contract, if that was the fact.

I think the reasonable conclusion is that the cancellation clause was inserted for the purpose of providing for the very contingency that did eventuate.

■■ The Parol evidence rule is a rule of substantive law in New York. Higgs v. De Maziroff, 263 N.Y. 473, 189 N.E. 555, 92 A.L.R. 807; see Zell v. American Seating Co., 2 Cir., 138 F.2d 641, reversed 322 U.S. 709, 64 S.Ct. 1053, 88 L.Ed. 1552. Therefore, this court, pursuant to Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487 as extended by Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, must apply the New York rule where there is a conflict of law.

■ Under New York law since the plaintiff's final acceptance was mailed in Illinois, it would be an Illinois contract and all matters bearing upon execution, interpretation and validity would be governed by Illinois law. Swift & Co. v. Bankers Trust Company, 280 N.Y. 135, 19 N.E.2d 992. The law in Illinois is that oral conversations prior to the written contract are merged into the writing, especially when the subject of the purported conversations is specifically dealt with in writings. Carlton v. Smith, 285 Ill.App. 380, 2 N.E.2d 116; Hercules Powder Co. v. Rowan, 245 Ill.App. 291; Telluride Power Transmission Co. v. Crane Co., 208 Ill. 218, 70 N.E. 319; Armstrong Paint & Varnish Works v. Continental Can Co., 301 Ill. 102, 133 N.E. 711; Sterling-Midland Coal Co. v. Great Lakes Coal & Coke Co., 334 Ill. 281, 165 N.E. 793; Ambarann Corp. v. Old Ben Coal Corp., 395 Ill. 154, 69 N.E.2d 835.

■ The plaintiff's motion to strike the testimony of Lewis as to conversations prior to the writings, is granted.

■ The defendant contends that though it be a binding contract, plaintiff cannot recover for he has failed to show that he was ready, willing and able to perform. The defendant argues that since plaintiff was not a manufacturer of Triplex bags, the plaintiff's ability to perform depended upon his contract with Mehl, the manufacturer of the bags, and since the offer and acceptance purportedly constituting the contract between plaintiff and Mehl had major variances, no enforceable contract between them came into existence; hence plaintiff was not ready, willing and able to perform his contract with General Foods. Although there is serious doubt as to the existence of any important variances in the offer and acceptance, such variances at most would merely make the contract voidable. But as defendant cancelled its contract with plaintiff prior to the possible avoidance of the contract between Mehl and plaintiff, the plaintiff at that time was ready, willing and able to perform his contract with General Foods.

The defendant also urges as a defense that the performance of the contract sued upon was in violation of certain regulations issued by the War Production Board. Defendant claims that plaintiff in his order with Mehl, and Mehl in its order with Ruberoid, failed to furnish a certificate as required by Section 3281.91, paragraph (f) of the W. P. B. Limitation Order L 279 as amended January 6, 1945 [10 F.R. 303]. Therefore, it is argued, that the orders were illegal and contrary to public policy, and defendant says these alleged orders are contrary to public policy and in violation of law for the further reason that they did not contain a duly authorized priority rating, thus violating Section 944.23, paragraph (c) (3) and paragraph (g) (7) of W. P. B. Priorities Regulation 3 as amended April 23, 1945 [10 F.R. 4294] and Section 944.7(a) of Priorities Regulation 1, as amended May 9, 1945 [10 F.R. 5355].

The purpose of the regulations issued by the War Production Board was to assure prompt deliveries of necessary materials to manufacturers filling Government contracts for goods needed for the armed forces. For this purpose the Chicago Quartermaster Depot sought and was instrumental in creating this chain of supply for Triplex bags. The War Production Board specifically provided for any viola-

tions of the regulations. "944.18. Violations. Any person who violates any provision of this regulation or any other rule, regulation or order of the Civilian Production Administration or who, by any statement or omission, wilfully falsifies any records which he is required to keep, or who otherwise wilfully furnishes false or misleading information to the Civilian Production Administration, and any person who obtains a delivery, an allocation of material or facilities, or a preference rating by means of a material and wilfull, false or misleading statement, may be prohibited by the Civilian Production Administration from making or obtaining further deliveries of material or using facilities under priority or allocation control and may be deprived of further priorities assistance. The Civilian Production Administration may also take any other action deemed appropriate, including the making of a recommendation for prosecution under Section 34(a) [35(A)] of the Criminal Code [18 U.S.C.A. § 80, 18 U.S.C.A. § 80], or under the Second War Powers Act [56 Stat. 176, 50 U.S.C.A. Appendix, § 631 et seq.]. [P.R. 1, as amended December 20, 1945, 10 F.R. 15340]." 15 C.F.R. 1945 Supp. § 944.18.

█ It therefore appears that violations of regulations are merely malum prohibitum and neither Congress nor the Administrator saw fit to declare void contracts the performance of which might violate regulations. There is specifically set forth the possible punishment for violation. However, the administration never went so far as to make a violation per se punishable, but merely used the word "may". In view of the above, even if it be assumed without deciding that the performance of some of the contracts in this chain may not have technically fulfilled the regulations of the War Production Board, I do not believe that this bars plaintiff's right to recover. See Macco Const. Co. v. Farr, et al., 9 Cir., 137 F.2d 52; Guffey-Gillespie Oil Co. v. Wright, 8 Cir., 281 F. 787; Chesnutt v. Schwartz, 293 Ill.App. 414, 12 N.E.2d 912; Rosasco Creameries, Inc. v. Cohen, 276 N.Y. 274, 11 N.E.2d 908, 118 A.L.R. 641; Annotations 118 A.L.R. 646.

The defendant also contends, First—that there was a timely cancellation of the contract. It says that in plaintiff's letter of June 2, 1945 to the defendant, plaintiff extended the initial cancellation date to July 15, 1945; that prior to that date, Lewis, in a telephone conversation with plaintiff, gave notice to plaintiff cancelling the alleged contract; Secondly, that plaintiff in his letter of June 2, 1945 extended the cancellation date until General Foods received a Government contract number. In his letter to plaintiff on June 1, 1945 [Exhibit 7] Lewis wrote—"We are unable at this date to give you Government contract number and definite shipping date. What is necessary procedure to maintain position in your manufacturing schedule for this order?

In his reply of June 2, 1945 [Exhibit 8], plaintiff wrote—

"Replying to your letter of June 1st in regard to your order No. 48368, we would suggest that if you can find it possible to confirm Government contract numbers by July 15th the latest, we will continue to keep this order on file for shipment as originally indicated, one-third each, September, October and November.

"In all probabilities you will have Government confirmation by July 15th, so we will just let the order stand as it is until you are in position to confirm the quantities and deliveries, with proper contract numbers."

On August 1, 1945 Lewis wrote plaintiff [Exhibit 9]—"Please refer to above order and cancel. This was a tentative order issued in anticipation of the receipt of an Army contract, which has not been received by us * * *".

Defendant's first contention is based upon the testimony of Lewis regarding a conversation which took place on July 12, 1945. He testified that "I called Mr. Stolteben on July 12th and told him we still did not have a Government contract; and as I recall it, he mentioned the fact that they had seven, or eight or nine weeks rated orders on hand at that time and that due to the absence of our Government contract it would appear that our deliveries would be somewhat delayed if we were to get the contract very promptly. I told him I was sorry we were holding this thing up but

we were not inclined to involve the company in the expenditure of $40,000 or $50,000 for materials that if we did not get the order could not be used."

Plaintiff testified he never intended the language in his letter to be an extension of the time to cancel the order but was merely to afford defendant an added opportunity to supply the Government contract numbers and specifications and still maintain its position in plaintiff's manufacturing schedule. Lewis further admitted that as best he could recall he had never written nor said in so many words that defendant did not have "a Government contract". His inquiries and statements related to "Government contract numbers". There was nothing in these conversations or letters to indicate to the plaintiff that the time for cancellation was even being discussed. Lewis in his letter was primarily concerned with maintaining defendant's place in plaintiff's manufacturing schedule. The record does not justify the conclusion that plaintiff's letter of June 2nd was or was intended to be an extension of the period for cancellation, and the purported oral cancellation on July 12th was too late. Even if it be assumed that plaintiff's letter of June 2, 1945 extended the right to cancel to July 15, 1945, what Lewis said in his conversation with the plaintiff on July 12th was too indefinite and vague to be effective as a cancellation of the contract. Vider v. Ferguson, 88 Ill.App. 136; Missouri & I. B. & B. R. Co. v. Illinois Terminal R. Co., 133 Ill.App. 178.

Defendant's Second contention that the effect of the June 2nd letter was to extend the period of cancellation to the time until General Foods received the Government contract numbers is, for similar reasons, without merit.

Defendant urges that in any event it had the right to cancel "at any time up to 90 days prior to delivery date" and that the delivery date for one-third [51,167 bags] was September; one third in October, and the final third in November; that on August 1, 1945 the order for the November delivery at least was cancelled when it wrote plaintiff—"Please refer to above order and cancel. This was a tentative order

issued in anticipation of the receipt of an Army contract, which has not been received by us, * * *".

The answer depends upon what the parties themselves meant by the phrase "at any time up to 90 days prior to delivery date". Plaintiff says that it meant a single cancellation which had to be exercised prior to the initial delivery.

Each of the parties in the chain of contracts were concerned with protection for themselves against sudden termination of Government contracts. Plaintiff refused to accept the 30 day period set forth in defendant's letter and order [Exhibits 1 and 2] and so wrote defendant explaining as his reason in another letter [Exhibit 3] that in order to have a quantity of bags delivered on a certain date, the manufacturer and suppliers would have to make their commitments for raw materials at least 90 days prior to delivery. It appears therefor that each one was committed to a specific number of bags for delivery on a specified date with the right to cancel 90 days prior to delivery.

I think the fair inference is that the plaintiff intended and sought to provide for cancellation upon 90 days notice prior to a specific delivery date of a specific number of bags. This inference is confirmed by Mehl's letter of April 18, 1945 to plaintiff, which reads—

"We have your order for General Foods for 153,500 Triplex, and your letter of the 17th mentioning the fact that they are attaching a 30 day cancellation privilege with the order. I think, for our interests, you should have the matter clarified before acknowledging the order. The way their clause is worded, it would appear that they are assuming they could cancel up to 30 days before specified delivery dates without incurring any responsibility. This is not in accordance with the contract termination terms as set up by the government. As you know, if we accept an order on these terms for the third and fourth quarter delivery, it means we will have to cover ourselves on paper at least 90 days before we start production. This means that we are responsible to Ruberoid for the amount of paper, and they in turn are re-

sponsible to Tomahawk if they have converted the pulp into crepe kraft.

I think now is the time we should definitely insist that customers place their order based on the standard terms of contract clauses, which take into account commitments contractors have made for materials, as well as labor and overhead.

They undoubtedly are familiar with these standard forms, and it appears to me that they are trying to leave an out for themselves.

Within the next few days, I will send you copies of these contract termination forms as I believe you should familiarize yourself with them. They are going to entail a considerable amount of bookkeeping on our part, as the record on each individual order has to be complete and in detail. You are not permitted, after a contract is cancelled, to go back and try to pick up the loose ends as to the purchasing of materials, etc. It has to be kept as you go along, which means that immediately upon receipt of an order, we will specify a definite quantity of material for that particular order.

I wish you would make this clear whenever it is necessary to any of the contractors.

\* \* \* \* \* \*

THC/jp

P.S. I will hold the order on my desk until you have a chance to clarify the matter."

Mehl wrote plaintiff that "The way their clause is worded, it would appear that they are assuming they could cancel up to 30 days before specified delivery dates"; and Mehl's conclusion is consistent with defendant's letter of April 16th accompanying the order wherein it says—"\* \* \* and we are reserving cancellation or change privilege up to 30 days prior to a specified delivery date."

Although upon receipt of Mehl's letter plaintiff wrote defendant insisting upon 90 days notice, he nevertheless raised no question as to defendant's right to cancel 90 days before specified delivery ·date, apparently acquiescing in the defendant's cancellation clause and with the understanding that it would mean 90 days prior to a specified delivery date.

I think that the defendant's letter of August 1, 1945 was a timely cancellation of so much of the order as was specified for delivery in November.

Plaintiff says that his damages are to be computed in accordance with the rules of Government contract termination procedure. Although in his letter of April 21, 1945 the plaintiff requested defendant to approve of the insertion of a Government contract termination clause in the order No. 48368 defendant rejected plaintiff's request and limited its response to the 90 day acceptance termination clause which the plaintiff accepted. The fact that a Government contract termination clause was included in plaintiff's contract with Mehl does not affect the contract between plaintiff and defendant. The two contracts are separate and distinct undertakings. Therefore, plaintiff's damages are to be determined by the applicable common or statutory law.

Since the contract was to be performed in Michigan, the elements and amount of damages are governed by the Michigan law. Section 64(2) (4) of the Uniform Sales Act, Comp.Laws 1929, § 9503(2, 4), which applies, states the measure of damages to be "\* \* \* the estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach of contract."

What loss directly and naturally result from a buyer's breach of a contract to manufacture goods is specifically set forth in Kingman & Co. v. Western Mfg. Co., 8 Cir., 92 F. 486, 490, which holds—"4. If materials have been purchased with which to fulfill the contract, but no work has been bestowed upon them at the time of the breach, the measure of the manufacturer's damages upon the articles which might have been made with such materials under the contract is the difference between the amount it would cost him to make and deliver them, including the cost of the materials, and their contract price, if greater, plus the difference between the cost and the market value of the materials that have been purchased at the time of the breach, if the market value be less than the cost." 92 F. at page 490.

The Uniform Sales Act also provides that buyer is not liable for expenses incurred

by seller after seller was notified of the repudiation when no work has been performed on the raw material at the time of repudiation.

■ The damages which plaintiff is entitled to recover by reason of defendant's breach include

1. Plaintiff's profit;

2. The damage plaintiff is subject to as a result of his breach of contract with Mehl.

Defendant knew that plaintiff was not a manufacturer and that plaintiff had to make commitments to the manufacturer in order to fulfill his contract. This liability reasonably included the manufacturer's profit, and expense incurred prior to the time the contract was called for. Defendant duly cancelled the one-third of bags specified for delivery in November, so plaintiff's profit is limited to two-thirds of the total he would have made had the defendant taken the entire lot. His profit is the difference between what he was charged by Mehl and the price defendant was to pay him. Plaintiff was to pay Mehl $44,412.34; plaintiff was to receive from defendant $47,672.13, showing a profit to plaintiff of $3,259.79, two-thirds of which plaintiff is entitled to recover, which is $2,173.20.

Mehl's profit for which plaintiff is liable, amounting to $6,266.13 is arrived at by taking Mehl's cost for two-thirds of the material required, which would have been $17,850 plus cost of manufacturing the bags, which Mehl testified to be .03177 cents per unit in May, June and July, 1945, for two-thirds of the original quantity—102,334 bags, and adding the "administrative cost" which Mehl's accountant testified to be 10.62 per cent of the cost of the labor and materials [Exhibit 33] and subtracting this total from Mehl's selling price.

■ Although Mehl testified that the value of the Triplex paper between the time it was ordered in June and August 1st, the time the contract was cancelled, depreciated about 50% from .085 cents a pound to .045 cents a pound, the record shows that Mehl purchased Triplex paper at .085 cents a pound after the contract was repudiated. Hence, Mehl apparently sustained no loss on the paper it had bought to fill plaintiff's

contract. Plaintiff's recoverable damage is his profit plus Mehl's profit—a total of $8,439.33, to which should be added interest at 6% from approximately May 17, 1945 to date, which approximates $1,392.49; therefore plaintiff is entitled to a decree for $9,831.66.

Plaintiff to submit on five days notice, proposed findings of fact and conclusions of law within fifteen days.