## CHARLES v. JUDGE & DOLPH, Limited.

### No. 51 C 1870.

United States District Court
N. D. Illinois, E. D.
April 28, 1953.

Norman S. Parker, Parker & Carter, Chicago, Ill., Avern B. Scolnik, Chicago, Ill., for the plaintiff.

Friedlund, Levin & Friedlund, Chicago, Ill., for the defendant.

CAMPBELL, District Judge.

Plaintiff, who alleges that he is the duly appointed *liquidateur amiable* of Societe Anonyme du Vermouth Export Pissis-Noilly, a corporation organized under the laws of the Republic of France, seeks damages for an alleged breach of contract. Defendant is a corporation organized and existing under the laws of the State of Illinois.

It is alleged in the complaint that on or about October 10, 1946, in Paris, France, defendant negotiated with the French corporation for the purchase of Pissis-Noilly Vermouth, "as per bottled sample submitted," and that defendant thereupon submitted a preliminary agreement, duly signed by its president. This "preliminary agreement" is attached to the complaint as Exhibit B, and purports to be signed in Paris, France, on October 10, 1946, by the president of the defendant. It states, in part:

"You agree to furnish us with a minimum of 1000 cases and a maximum of 1500 cases monthly shipments to start January 15th 1947. This contract shall remain in effect for five years. * * * The manufacturer agrees to furnish Pissis-Noilly lighter in color and drier in taste than sample submitted—in order to suit the American taste. Certain other stipulations of the final contract, such as letters of credit, advertising etc. will be mutually agreed upon."

It is next alleged that on December 20, 1946, the defendant and the French corporation signed an agreement, and that plaintiff thereby undertook to furnish defendant with a minimum of 1500 cases of vermouth per month, beginning January 15, 1947, at a price of $9.50 per case. A purported copy of this agreement is attached to the complaint as Exhibit C. The agreement refers to the French exporting corporation as the "principal," and the Illinois distributing cor-

poration as the "agent," and provides, in part, as follows:

"5. The Agent·shall order not less than fifteen hundred (1,500) cases per month during the first year; two thousand (2,000) cases per month during the second year; three thousand (3,000) cases per month during the third year; four thousand (4,000) cases per month during the two following years. All orders placed by the Agent and not filled by the Principal for any cause whatever shall be considered as sales made by the Agent in calculating the number of cases sold by it within any certain year or period of this agreement.

\* \* \* \* \* \*

"11. The Principal undertakes to furnish the product lighter in color and drier in taste than the sample submitted to the Agent, but the product shall be of the same character and quality as the sample submitted to the Agent.

\* \* \* \* \* \*

"13. The present agreement shall remain in effect for five years.

"14. If the Agent shall fail to order the above mentioned minimum number of cases per month, the Principal may, at its election at any time thereafter, terminate this agreement by giving not less than thirty days notice in writing to the Agent.

"In case of any other breach of the provisions of this agreement by either the Principal or the Agent, said agreement may be terminated by the other party by giving not less than sixty days notice in writing.

"At the expiration of said thirty or sixty day period, as the case may be, as provided in this paragraph, this contract shall be considered terminated and of no further force or effect."

The complaint further alleges that the French corporation, pursuant to orders received from the defendant, made three shipments of 1,500 cases of vermouth; that the defendant accepted two shipments of 1,500 cases each; and refused one shipment of 1,500 cases; and that the defendant has not

paid the full purchase price of said three shipments, as specified in the agreement.

It is next alleged that the French corporation was at all times willing and able to fulfill its obligations under the agreement, but that the defendant terminated the agreement without cause by a letter dated September 9, 1949. The contents of that letter are recited in Exhibit D· of the complaint. Some of the material statements contained therein are as follows:

"We have a great deal of difficulty in selling Vermouth Export Pissis-Noilly. We have made an earnest effort to dispose of the merchandise which was purchased from you, but the quality of this product is not in line with competitive items on the market * * *. We have had to refilter the product because of cloudiness and sediment, and as you know, recently we wrote to you and ask [sic] for new labels, as the old labels were not in keeping with the original merchandise received by us * * *.

"To be fair with you, we want you to know that it is simply impossible for us to continue with the sale of this product in the United States. We have therefore elected to terminate and cancel any and all previous arrangements made with you as set forth in our agreement, and are accordingly giving you sixty days' notice in writing to the effect that we are discontinuing this line * * *."

Plaintiff alleges that the net profit loss incurred by the French corporation on all case of vermouth not purchased by the defendant under the agreement is $3.00 per case. Plaintiff seeks recovery for loss of profit on the sale of 169,500· cases, plus the balance due to the French corporation for vermouth allegedly shipped to defendant, or an aggregate of $523,500, together with interest and costs.

In its answer, defendant admits that its president signed the instrument attached to the complaint as Exhibit B, and that it entered into the agreement designated Exhibit C. In paragraph 3 of the answer, defendant describes in detail the negotiations preceding the agreement between it and the French corporation. This description consists, for the most part, of statements which a representative of the defendant made to a representative of the French corporation before the execution of the agreement. It is alleged, for example, that the French corporation was informed "that in order for defendant to serve as an outlet for the vermouth of the Societe Anonyme, it would be necessary that the vermouth be merchantable and saleable in the United States; that in order for the vermouth to be merchantable and saleable in the United States it must be clear and without sediment, must be bottled in attractive bottles of uniform size holding not to exceed thirty fluid ounces and that the label on both the front and the back of the bottles must be approved by the United States and by the various states * * *." Paragraph 3 contains several other references to these negotiations; each of the references concerns either an act performed by a representative of the French corporation or a statement made by a representative of the defendant.

The answer next alleges that defendant received two shipments of vermouth, not three, as charged in the complaint, and that said two shipments contained defective vermouth. Defendant alleges that the defects were not cured in a subsequent shipment, despite assurances from the French corporation that said shipment "would conform to the specifications." Finally, defendant alleges that it elected to terminate the contract "for the failure of the vermouth to conform to the warranties, express and implied, of the contract * * *."

Defendant has also filed a counterclaim, alleging therein the matter contained in its answer. Defendant seeks damages for loss of profits under the agreement, and for "expense incurred in an effort to recondition the vermouth" which was shipped by the French corporation. In all, defendant seeks judgment for $908,820. ·

The matter is now before the court on plaintiff's motion to strike the answer and to dismiss the counterclaim. Plaintiff contends that the answer and counterclaim both inject extraneous and inadmissable matter

into this suit Plaintiff argues that paragraph 3 of the answer is particularly objectionable, since it alleges oral negotiations prior to the execution òf the written contract, and, according to plaintiff, evidence of such negotiations will be inadmissable at the trial.

The court must first determine which law governs the construction and enforcement of the contract. Since jurisdiction is based upon diversity of citizenship, the conflict of laws rules of the courts of Illinois are binding upon this court. Lemp Brewing Co. v. Ems Brewing Co., 7 Cir., 1947, 164 F.2d 290. The courts of Illinois have determined that "Parties are presumed to contract with reference to the law of the state where their contract is to be performed, rather than of the state where the contract was made, and to agree to be governed by such law." George v. Haas, 1924, 311 Ill. 382, 386, 143 N.E. 54, 55. The pleadings in the instant case indicate that the contract was to be performed in Illinois; it is clear, then, that each of the legal issues raised by plaintiff's motion must be resolved according to the law of Illinois.

The courts of Illinois have repeatedly held that evidence of negotiations conducted prior to the execution of a written contract cannot be admitted for the purpose of altering the terms of the contract. In Armstrong Paint & Varnish Works v. Continental Can Co., 1922, 301 Ill. 102, 106, 133 N.E. 711, 713, the Supreme Court of Illinois held:

"* * * the contentions of the parties to the contract are not the criterion which should guide the court in determining whether the written contract is a full expression of the agreement of the parties. The court must determine this from the writing itself. If it imports on its face to be a complete expression of the whole agreement—that is, contains such language as imports a complete legal obligation—it is to be presumed that the parties introduced into it every material item and term, and parol evidence cannot be admitted to add another term to the agreement, although the writing contains nothing on the particular term to which the parol evidence is directed."

For other statements of the rule set forth in the Armstrong Case, see Saddler v. National Bank of Bloomington, 1949, 403 Ill. 218, 85 N.E.2d 733; Decatur Lumber & Mfg. Co. v. Crail, 1932, 350 Ill. 319, 183 N.E.2d 228; Green v. Ashland Sixty-Third State Bank, 1931, 346 Ill. 174, 178 N.E. 468; Schneider v. Neubert, 1923, 308 Ill. 40, 139 N.E. 84. See also E. J. Albrecht Co. v. New Amsterdam Casualty Co., 7 Cir., 1947, 163 F.2d 16; Hines v. Ward Baking Co., 7 Cir., 1946, 155 F.2d 257.

Some of the allegations in defendant's answer and counterclaim refer to conditions which were not included in the contract between defendant and the French corporation. Under the decisions of the courts of Illinois, referred to above, these conditions cannot now be added to the contract. However, defendant proceeds upon an alternative theory: it contends that the contract of sale does not preclude the existence of certain implied warranties, as provided in the Uniform Sales Act, Ill.Rev. Stat. Ch. 121½, § 1 et seq. The defendant relies particularly upon Sections 14, 15, and 16 of the Act, which provide:

"§ 14. Implied warranty in sale by description. Where there is a contract to sell or a sale of goods by description, there is an implied warranty that the goods shall correspond with the description and if the contract or sale be by sample as well as by description, it is not sufficient that the bulk of the goods corresponds with the sample if the goods do not also correspond with the description.

"§ 15. Implied warranties of quality. Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears

that the buyer relies on the seller's skill or judgment * * * there is [an] implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description, * * * there is an implied warranty that the goods shall be of merchantable quality.

* * * * * *

"§ 16. Implied warranties in sale by sample. In case of a contract to sell or a sale by sample:

"(a) There is an implied warranty that the bulk shall correspond with the sample in quality.

* * * * * *

"(c) If the seller is a dealer in goods of that kind, there is an implied warranty that the goods shall be free from any defect rendering them unmerchantable which would not be apparent on reasonable examination of the sample."

■ The courts of Illinois recognize that such implied warranties are contained in every contract of sale covered by the applicable Sections, unless expressly rejected by the parties to the contract. See for example, Sterling-Midland Coal Co. v. Great Lakes Coal & Coke Co., 1929, 334 Ill. 281, 291, 165 N.E. 793, 797, wherein the court stated:

"All contracts are presumed to have been entered into, not only with reference to the general customs and usages of the trade, but with reference to the provisions of the statutory law applicable thereto, and, when not negatived it must be held that it is one of the understandings of the parties to the contract for sale that sections 15 and 16 of the Uniform Sales Act will apply."

In that case, however, the court found that the provisions of the sales contract "specifi-

cally negatived" the implied warranties set forth in the Uniform Sales Act. The same result was reached in Alex J. Mandl, Inc., v. San Roman, 7 Cir., 1948, 170 F.2d 839, wherein the court found express language in a contract of sale which precluded the existence of an implied warranty of merchantability.

The contract in the instant case does not contain language which indicates that the parties rejected the warranties provided by Illinois statute. The sole provision of the contract which relates to quality is paragraph 11, whereby the French corporation undertakes "to furnish the product lighter in color and drier in taste than the sample submitted" by the defendant, and warrants that "the product shall be of the same character and quality as the sample submitted" by the defendant.

■ In the absence of contrary language in the contract, such as was found in the Mandl Case, supra, this court must hold that the implied warranties described in the Uniform Sales Act are applicable to the transaction between the defendant and the French corporation. And, since the matter contained in the answer and the counterclaim is essential to the introduction of evidence relating to the warranties, plaintiff's motion to strike the answer and counterclaim must be denied.

The court has based its decision solely upon the pleadings; and the decision does not prejudice plaintiff's right to demonstrate at the trial that paragraph 11, or any other provision of the contract, should exclude all implied warranties. For that limited purpose, evidence of prior negotiations may be introduced.

For the reasons stated in this memorandum, plaintiff's motion to strike the answer and to dismiss the counterclaim is hereby denied.